1  RONALD J. TENPAS
   Acting Assistant Attorney General
2  Environment and Natural Resources Division
   U.S. Department of Justice
3  ROBERT D. MULLANEY (Cal. Bar No. 116441)
   Trial Attorney
4  Environmental Enforcement Section
   U.S. Department of Justice
5  301 Howard Street, Suite 1050
   San Francisco, CA 94105
6  Tel: (415) 744-6491
   Fax: (415) 744-6476
7  E-mail: Robert.Mullaney@usdoj.gov

8  GEORGE S. CARDONA
   United States Attorney
9  Central District of California
   Federal Building, Suite 7516
10 300 North Los Angeles Street
   Los Angeles, CA 90012
11 Tel: (213) 894-2400
   Fax: (213) 894-0141

12

13 Attorneys for Plaintiff United States of America

14                    UNITED STATES DISTRICT COURT
15                  CENTRAL DISTRICT OF CALIFORNIA
                           WESTERN DIVISION
16

17 UNITED STATES OF AMERICA,        )
   et al.,                          )
18             Plaintiffs,          )   Case No. CV06-165-CAS(RZx)
                                    )
19        v.                        )
                                    )   UNITED STATES' REQUEST TO
20 AZUSA PIPE AND TUBE              )   ENTER CONSENT DECREE
   BENDING CORP., et al.,           )   AND [PROPOSED] ORDER
21                                  )
22             Defendants.          )
                                    )
23 ─────────────────────────────────

24

25

26

27

28

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

X  Priority
X  Send
X  Clsd
X  Enter
___ JS-5/JS-6
___ JS-2/JS-3



# TABLE OF CONTENTS

I.     BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    PROPOSED CONSENT DECREE PROVISIONS . . . . . . . . . . . . . . . . . 4

III.   THE CONSENT DECREE IS FAIR, REASONABLE, AND FURTHERS
       CERCLA'S GOALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       A.   Standard of Review for Approving a Consent Decree . . . . . . . . . . . 4

       B.   The Consent Decree is Fair . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       C.   The Consent Decree is Reasonable and Furthers
            CERCLA's Goals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       D.   After Considering the Public Comment, the United States Has
            Concluded that the Consent Decree is Fair and Reasonable . . . . . . 7

            1.   Aerojet's Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            2.   CR-6's Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            3.   United States' Response to Comments . . . . . . . . . . . . . . . . 8

                 a. Aerojet's ASBCA Settlement Rights . . . . . . . . . . . . . . . 9

                 b. Settling Federal Agencies' Contribution Protection . . . . . . 9

                      i. Settling Federal Agencies are entitled to contribution
                         protection in the same manner as settling non-
                         governmental entities . . . . . . . . . . . . . . . . . . . . . . . 10

ii.  EPA properly established the Settling Federal
     Agencies' allocated share based on their
     comparative fault . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

iii. The scope of the contribution protection afforded
     the Settling Federal Agencies is appropriate  . . . . 15

c. Adequacy and Use of Settlement Amounts . . . . . . . . . . . 16

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Attachment A  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Attachment B  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

TABLE OF AUTHORITIES

<u>FEDERAL CASES</u>

<u>Ahern v. Central Pacific Freight Lines</u>, 846 F.2d 47 (9th Cir. 1988) . . . . . . . . . . 4

<u>Avnet, Inc. v. Allied-Signal, Inc.</u>, 825 F. Supp. 1132 (D.R.I. 1992) . . . . . . . . . . 11

<u>Carson Harbor Village, Ltd. v. Unocal Corp.</u>, 270 F.3d 863 (9th Cir. 2001) . . . 14

<u>Citizens for a Better Env't v. Gorsuch</u>, 718 F.2d 1117 (D.C. Cir. 1983) . . . . . . . 5

<u>Kaiser Aluminum v. Catellus Dev. Corp.</u>, 976 F.2d 1338 (9th Cir. 1992) . . . . . . . 7

<u>Officers for Justice v. Civil Serv. Comm'n</u>, 688 F.2d 615 (9th Cir. 1982) . . . . . . 5

<u>Pinal Creek Group v. Newmont Mining Corp.</u>, 118 F.3d 1298 (9th Cir. 1997) . 14

<u>SEC v. Randolph</u>, 736 F.2d 525 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>U.S. v. Burlington Northern & Santa Fe Ry. Co.</u>,
       479 F.3d 1113 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

<u>U.S. v. Simon Wrecking, Inc.</u>, 481 F. Supp. 2d 363 (E.D. Pa. 2007) . . . . . . . . . . 10

<u>U.S. v. Wallace</u>, 893 F. Supp. 627 (N.D. Tex. 1995) . . . . . . . . . . . . . . . . . . . . . . 11

<u>United States v. Bechtel Corp.</u>, 648 F.2d 660 (9th Cir. 1981) . . . . . . . . . . . . . . . 5

United States v. Cannons Eng'g Corp.,
     899 F.2d 79 (1st Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 13, 15, 17

United States v. Davis, 261 F.3d 12 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. George Trucking, Inc., 34 F.3d 1081 (1st Cir. 1994) . . . . . . . . . 11

United States v. Hunter, 70 F. Supp. 2d 1100 (C.D. Cal. 1999) . . . . . . . . . . . . . 10

United States v. Montrose Chemical Corp. of California,
     50 F.3d 741 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 13

United States v. Nicolet, Inc., 1989 WL 95555 (E.D. Pa. Aug. 15, 1989) . . . . . . . 7

United States v. Rohm & Haas Co., 721 F. Supp. 666 (D.N.J. 1989) . . . . . . . .  17

United States v. SEPTA, 235 F.3d 817 (3d Cir. 2000) . . . . . . . . . . . 5, 6, 11, 16, 18

United States v. Seymour Recycling Corp., 554 F. Supp. 1334 (S.D. Ind. 1982) . 7

United States v. State of Oregon, 913 F.2d 576 (9th Cir. 1990) . . . . . . . . . . 4, 5, 6

FEDERAL STATUTES

42 U.S.C. § 6973 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 9601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

42 U.S.C. § 9606 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 17

42 U.S.C. § 9607 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 14

42 U.S.C. § 9613 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 14

42 U.S.C. § 9620 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

42 U.S.C. § 9622 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

FEDERAL REGULATIONS

28 C.F.R. § 50.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8

FEDERAL LEGISLATIVE HISTORY

H.R. Rep. No. 99-253, pt. 3 (1985), as reprinted in
         1986 U.S.C.C.A.N. 3038 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1    On June 22, 2007, Plaintiffs United States and the California Department of

2 Toxic Substances Control ("DTSC") filed the First Amended Complaint for Cost

3 Recovery and Injunctive Relief ("complaint") against Azusa Pipe and Tube

4 Bending Corp. ("Azusa Pipe"), Frederick G. Tressel, Ronald F. Tressel, and

5 Frederick G. Tressel and Violet M. Tressel, in their representative capacity as

6 Trustees of the Tressel Family Trust (jointly, "Settling Defendants") under the

7 Comprehensive Environmental Response, Compensation, and Liability Act

8 ("CERCLA") and the Solid Waste Disposal Act, as amended by the Resource

9 Conservation and Recovery Act of 1976 and the Hazardous and Solid Waste

10 Amendments of 1984 (collectively "RCRA").  Concurrently, Plaintiffs lodged a

11 proposed Consent Decree with Settling Defendants to resolve the allegations of

12 the complaint.

13    Pursuant to 28 C.F.R. § 50.7, the United States published notice of the

14 lodging of the proposed Consent Decree in the Federal Register on July 6, 2007.[1/]

15 The proposed Decree was subject to a thirty-day comment period, which expired

16 on August 6, 2007.  On July 24, 2007, the Court inadvertently, but prematurely,

17 entered the Consent Decree.  During the public comment period, which has now

18 closed, the United States received a comment letter from Aerojet-General

19 Corporation ("Aerojet"), a potentially responsible party ("PRP") at the Baldwin

20 Park Operable Unit (the "BPOU Area"), and a comment letter on behalf of six

21 PRPs at the BPOU Area:  Azusa Land Reclamation Co., Inc., Fairchild Holding

22 Corp., Hartwell Corporation, Chemical Waste Management, Inc., Reichhold, Inc.,

23 and Winco Enterprises Inc. (collectively, the "Cooperating Respondents" or "CR-

24 6").

25    At this point, the United States has already entered into nine settlements

26 with private PRPs at the BPOU Area, including a settlement with Aerojet and its

27 _____

28 [1/]  A copy of the notice, 72 Fed. Reg. 37,053-37,054, is attached to this request as
Attachment A.

parent corporation and a settlement with the CR-6.  Praskins Decl. ¶¶9, 10, 11.
Eight of these nine settlements have been approved by this Court. Id. at ¶9.  The
ninth settlement was approved by a Bankruptcy Court. Id.  If the Court enters the
Consent Decree in this case, the United States will have recovered approximately
$27.5 million of the $32.1 million it had incurred in response costs for the BPOU
Area, which represents an 86 percent recovery of the United States' past costs. Id.
at ¶21.

   After review of the public comments regarding the Azusa Pipe Consent
Decree, the United States has concluded that the Decree is fair, consistent with the
purposes of CERCLA and RCRA, and in the public interest.  Pursuant to
Paragraphs 1 and 51 of the Azusa Pipe Consent Decree, Settling Defendants
consented to entry of the Decree.  Accordingly, the United States requests the
Court to sign and enter the attached proposed Order, which will re-approve the
Court's entry of the Consent Decree and designate the effective date of the Decree
as the date that the Court enters the proposed Order.

## I.   BACKGROUND

   The BPOU Area is a several-mile long area of groundwater contamination
in the San Gabriel Valley in California.  Praskins Decl. ¶3.  In May 1984, the
United States Environmental Protection Agency ("EPA") placed the San Gabriel
Valley Area 2 site on the National Priorities List under CERCLA. Id. at ¶4.[2]
EPA's subsequent investigation revealed the tremendous extent of groundwater
contamination in the San Gabriel Valley. Id. at ¶5.  During the past 25 years, more
than one-quarter of the municipal water supply wells in the San Gabriel Valley
have been found to be contaminated, requiring water companies to shut down
wells, install new treatment facilities, and take other steps to ensure that they can
supply water meeting federal and State drinking water standards. Id.

---

[2] EPA created the BPOU Area to clean up groundwater contamination at the San
Gabriel Valley Area 2 site.  Praskins Decl. ¶3.

After its investigation, EPA selected an interim remedy in a Record of Decision ("ROD"), as supplemented by an Explanation of Significant Differences ("ESD"), to address the BPOU Area's groundwater contamination. Id. at ¶6. The selected interim remedy provides for the construction and operation of groundwater extraction wells, treatment facilities, and conveyance facilities capable of pumping and treating approximately 22,000 gallons per minute of contaminated groundwater from the BPOU Area. Id.

On June 30, 2000, pursuant to CERCLA Section 106(a), 42 U.S.C. § 9606(a), and RCRA Section 7003, 42 U.S.C. § 6973, EPA issued a unilateral administrative order ("Order") to nineteen potentially responsible parties ("PRPs"), including Azusa Pipe, requiring each of them to perform at the BPOU Area the remedial action activities set forth in the ROD as supplemented by the ESD. Id. at ¶7. A group of seven PRPs, Aerojet and the CR-6, are complying with EPA's Order by implementing a joint cleanup and water supply project with certain water purveyors in the San Gabriel Valley. Id. More than $80 million dollars have been spent by the PRPs in designing and implementing the remedy. Id.

In January 2006, the United States, on behalf of EPA, filed this action against Settling Defendants, seeking: (1) recovery of unreimbursed costs incurred for activities undertaken in response to the release or threatened release of hazardous substances at the BPOU Area pursuant to CERCLA Section 107, 42 U.S.C. § 9607; (2) performance of studies and response work by Settling Defendants at the BPOU Area pursuant to CERCLA Section 106, 42 U.S.C. § 9606; and (3) injunctive relief under RCRA Section 7003, 42 U.S.C. § 6973. The complaint was amended in June 2007 to add DTSC's claim for recovery of its response costs. As of June 30, 2004, EPA had incurred response costs at the BPOU Area of more than $32.1 million. Praskins Decl. ¶9. By March 2007, EPA had received reimbursement of approximately $26 million of its costs. Id. DTSC

-3-

1  incurred response costs in excess of $3 million and had received reimbursement of
2  approximately $570,000.  Complaint ¶39.

3  **II.     PROPOSED CONSENT DECREE PROVISIONS**

4         The Consent Decree requires Settling Defendants to pay $1,025,000 to the
5  United States and $75,000 to DTSC in reimbursement of costs incurred by the
6  United States and DTSC at the BPOU Area.  Decree ¶¶5, 6, 9.  Settling
7  Defendants also agree not to assert any claims against the United States or DTSC
8  for reimbursement of costs incurred by Settling Defendants with respect to the
9  BPOU Area.  Id. at ¶27.  In addition, the Consent Decree requires the General
10  Services Agency, Department of the Army, Department of Defense, Department of
11  the Navy, Department of the Air Force, and the Army Corps of Engineers
12  (collectively, the "Settling Federal Agencies") to pay $490,000 to the United
13  States and $105,000 to DTSC in reimbursement of costs incurred by the United
14  States and DTSC at the BPOU Area.  Id. at ¶11.

15  **III.    THE CONSENT DECREE IS FAIR, REASONABLE, AND
         FURTHERS CERCLA'S GOALS**
16

17         The trial court should enter a consent decree if it is "'reasonable, fair, and
18  consistent with the purposes that CERCLA is intended to serve.'"  United States v.
19  Montrose Chemical Corp. of California, 50 F.3d 741, 747 (9th Cir. 1995) (citation
20  omitted).  Because this Consent Decree meets this governing standard, the United
21  States requests the Court to grant its request to re-approve and enter the Consent
22  Decree.

23         A.     Standard of Review for Approving a Consent Decree

24         Approval of a proposed consent decree is committed to the informed
25  discretion of the district court.  United States v. State of Oregon, 913 F.2d 576,
26  580 (9th Cir. 1990); SEC v. Randolph, 736 F.2d 525, 529 (9th Cir. 1984).  The
27  court's discretion should be exercised in favor of the strong policy favoring
28  voluntary settlement of litigation.  Ahern v. Central Pacific Freight Lines, 846

-4-

1   F.2d 47, 48 (9th Cir. 1988). "CERCLA's policy of encouraging early settlements
2   is strengthened when a government agency charged with protecting the public
3   interest 'has pulled the laboring oar in constructing the proposed settlement.'"
4   Montrose Chemical Corp., 50 F.3d at 746, citing United States v. Cannons Eng'g
5   Corp., 899 F.2d 79, 84 (1st Cir. 1990); see also United States v. SEPTA, 235 F.3d
6   817, 822 (3d Cir. 2000) (judicial review of a CERCLA settlement negotiated by
7   the United States should be informed by the deference owed to "EPA's expertise
8   and to the law's policy of encouraging settlement"). Accordingly, the Ninth
9   Circuit has stated that "a district court reviewing a proposed consent decree 'must
10  refrain from second-guessing the Executive Branch.'" Montrose Chemical Corp.,
11  50 F.3d at 746; see also United States v. Bechtel Corp., 648 F.2d 660, 666 (9th
12  Cir. 1981) (the balancing of interests "must be left, in the first instance, to the
13  discretion of the Attorney General").

14      In undertaking its review, a court is not required to make the same in-depth
15  analysis of a proposed settlement that it would be required to make in order to
16  enter a judgment on the merits after trial. "The trial court in approving a
17  settlement need not inquire into the precise legal rights of the parties nor reach and
18  resolve the merits of the claims or controversy, but need only determine that the
19  settlement is fair, adequate, reasonable and appropriate under the particular facts
20  and that there has been valid consent by the concerned parties." Citizens for a
21  Better Env't v. Gorsuch, 718 F.2d 1117, 1126 (D.C. Cir. 1983); accord, State of
22  Oregon, 913 F.2d at 582.

23      A court does not have the authority to modify the decree. Instead, it must
24  either accept or reject the decree as submitted. See Officers for Justice v. Civil
25  Serv. Comm'n, 688 F.2d 615, 630 (9th Cir. 1982). The relevant standard "is not
26  whether the settlement is one which the court itself may have fashioned, or
27  considers as ideal, but whether the proposed decree is fair, reasonable, and faithful
28  to the objectives of the governing statute." Cannons Eng'g Corp., 899 F.2d at 84.

-5-

B.    The Consent Decree is Fair

In assessing a CERCLA settlement, courts consider both procedural and substantive fairness. Cannons Eng'g Corp., 899 F.2d at 86-88.  As the Ninth Circuit concluded in State of Oregon, 913 F.2d at 581, if a settlement is the product of good faith, arm's length negotiations, it is "presumptively valid and the objecting party has a 'heavy burden of demonstrating that the decree is unreasonable.'"  In this case, Court should find that the settlement meets the test of procedural fairness:  the parties were represented by independent counsel, negotiated for over a year, and participated in mediation with a Court-appointed Special Master before finally reaching a settlement agreement.  Praskins Decl. ¶19.

In Cannons Eng'g Corp., the court explained that substantive fairness addresses "concepts of corrective justice and accountability:  a party should bear the cost of the harm for which it is legally responsible."  899 F.2d at 87. Therefore, "the terms of a consent decree are substantively fair if they are based on comparative fault and if liability is apportioned according to rational estimates of the harm each party has caused."  SEPTA, 235 F.3d at 823.  However, the measure of comparative fault is necessarily imprecise and should be left largely to EPA's expertise:  "the chosen measure of comparative fault should be upheld unless it is arbitrary, capricious, and devoid of a rational basis."  Cannons Eng'g Corp., 899 F.2d at 87.

As explained in Section D below, the Court should conclude that the settlement is substantively fair because it reflected a reasonable compromise of the litigation that took into account the comparative fault of the parties and apportioned liability according to rational estimates of the harm caused by each party.

C.    The Consent Decree is Reasonable and Furthers CERCLA's Goals

In ascertaining whether a monetary settlement is reasonable under

-6-

1  CERCLA, a court considers whether the settlement furthers the statute's goals and

2  the extent to which the court's approval of the decree is in the public interest.

3  United States v. Nicolet, Inc., 1989 WL 95555 at *5, 30 Env't Rep. Cas. 2061

4  (BNA) (E.D. Pa. Aug. 15, 1989); see also United States v. Seymour Recycling

5  Corp., 554 F. Supp. 1334, 1339 (S.D. Ind. 1982).  The twin purposes of CERCLA

6  are to ensure that hazardous substances released into the environment are promptly

7  and properly cleaned up, and to assure that the cost of that cleanup is borne by

8  those parties responsible for the releases.  Kaiser Aluminum v. Catellus Dev.

9  Corp., 976 F.2d 1338, 1340 (9th Cir. 1992).  In this case, the payments by Settling

10  Defendants and the Settling Federal Agencies will be made to EPA's BPOU Area

11  Special Accounts or will be transferred to the EPA Hazardous Substance

12  Superfund.  Decree ¶¶ 8, 11.  If the Court enters the Consent Decree in this case,

13  the United States will have recovered approximately $27.5 million of the $32.1

14  million it had incurred in response costs for the BPOU Area.  Praskins Decl. ¶21.

15  This represents an 86 percent recovery of the United States' past costs.  Id.  The

16  payments in this Consent Decree will further CERCLA's goals and serve the

17  public interest by requiring responsible parties to pay for the cleanup costs,

18  thereby allowing EPA to either address any future shortfalls in conducting or

19  financing the BPOU Area remedy, or to reimburse the Superfund.  Decree ¶¶ 8,

20  11.

21  D.  After Considering the Public Comments, the United States Has
     Concluded that the Consent Decree is Fair and Reasonable

22

23  The United States received public comments from Aerojet and the CR-6

24  during the public comment period.[3]  These comments are summarized below.

25  1.  Aerojet's Comments

26  Comment #1:  The Consent Decree cannot affect Aerojet's rights under a separate

27

28

[3] These comments are appended as Attachment B to this Request to Enter.

-7-

1 Armed Services Board of Contract Appeals ("ASBCA") Settlement Agreement
2 with the United States or its rights under contracts with the United States.
3 Comment #2:  CERCLA section 113 does not permit the United States to grant
4 contribution protection to Settling Federal Agencies.
5 Comment #3:  There is no reasonable basis for concluding that the settlement with
6 the Settling Federal Agencies is adequate.  Moreover, the contribution protection
7 afforded the Settling Federal Agencies is broader than the matters settled in
8 violation of CERCLA section 113.
9 Comment #4:  EPA and DTSC should use the amounts paid by Settling
10 Defendants and Settling Federal Agencies for BPOU Site costs, and should not
11 have the flexibility to use these funds for the cleanup of other Superfund sites.[4]
12           2.     CR-6's Comments
13 Comment #5:  The Settling Federal Agencies are not named in the Complaint and
14 the proposed Consent Decree does not detail any allegations of law or fact against
15 the Settling Federal Agencies.  The Consent Decree does not support contribution
16 protection for the Settling Federal Agencies.
17 Comment #6:  The Settling Federal Agencies should not receive a covenant not to
18 sue or contribution protection for future costs.
19 Comment #7:  The settlement amount for the Settling Federal Agencies is
20 inadequate.
21 Comment #8:  Same as comment #4 above.
22           3.     United States' Response to Comments
23           After careful consideration of the public comments, the United States has
24 concluded that the comments did not disclose any facts or considerations
25 indicating that the proposed Consent Decree is inappropriate, improper or
26 inadequate.  28 C.F.R. § 50.7.  Our response to comments is detailed below.
27 _____

28 [4] Neither Aerojet nor the CR-6 have objected to the amount paid by the Settling
Defendants or the contribution protection afforded to them.

## a. Aerojet's ASBCA Settlement and Contract Rights

Aerojet stated in its comment letter that it has certain rights under the ASBCA Settlement Agreement and certain rights under its government contracts. In the letter, Aerojet requested that the United States confirm that the Consent Decree is not intended to impair Aerojet's rights.

The Consent Decree specifically states in Section XII (Effect of Settlement; Contribution Protection) that:

> [N]othing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree. The preceding sentence shall not be construed to waive or nullify any rights that any person not a signatory to this Decree may have under applicable law.

Decree ¶32. Therefore, the Decree should not be construed to waive or nullify Aerojet's rights under the ASBCA Settlement Agreement or its government contracts.

The Settling Federal Agencies are provided with contribution protection under 42 U.S.C. § 9613(f)(2) for the matters addressed by the Decree. Decree ¶33. However, Aerojet's comment letter states that its rights are based on the ASBCA Settlement Agreement or government contracts. Aerojet is not asserting that its rights are based on potential CERCLA contribution claims under 42 U.S.C. § 9613(f)(1) for matters addressed by the Decree. Consequently, the United States believes that Aerojet's rights would not be affected by the contribution protection afforded the Settling Federal Agencies.

## b. Settling Federal Agencies' Contribution Protection

Aerojet asserts that CERCLA Section 113 does not permit the United States to grant contribution protection to the Settling Federal Agencies. In addition, both Aerojet and the CR-6 assert that the Settling Federal Agencies should not receive contribution protection because there is not an adequate basis to evaluate the settlement. Both Aerojet and the CR-6 also claim that the Settling Federal Agencies should not receive a covenant not to sue or contribution protection for

1  future costs.  Finally, Aerojet argues that the contribution protection is
2  impermissibly broader than the matter settled.  As demonstrated below, these
3  assertions are unfounded.

4          i.  Settling Federal Agencies are entitled to contribution
           protection in the same manner as settling non-governmental
5          entities

6  Under CERCLA, the United States has a "unique role:  through the EPA it
7  is responsible for enforcing CERCLA and recovering response costs to protect the
8  public fisc.  At the same time there are governmental agencies who are themselves
9  PRPs."  United States v. Hunter, 70 F. Supp. 2d 1100, 1108 (C.D. Cal. 1999).  In
10 recognition of this unique role, courts have permitted the United States to proceed
11 under CERCLA Section 107 to impose joint and several liability even when
12 governmental agencies are PRPs.  Id.; accord, U.S. v. Simon Wrecking, Inc., 481
13 F. Supp. 2d 363, 368 (E.D. Pa. 2007).

14 As the Hunter court recognized, the United States' unique role is rooted in
15 CERCLA's statutory scheme.  CERCLA Section 107 allows the United States to
16 recover all costs of removal or remedial action.  42 U.S.C. § 9607.  However,
17 pursuant to CERCLA Section 120, Congress waived the United States's sovereign
18 immunity to claims from private parties as follows:

19         Each department, agency, and instrumentality of the United States . . . shall
           be subject to, and comply with, this chapter in the same manner and to the
20         same extent, both procedurally and substantively, as any nongovernmental
           entity, including liability under section 9607 of this title.
21

22 42 U.S.C. § 9620(a)(1) (emphasis added).  CERCLA Section 113 provides for
23 contribution actions, stating that "persons" who resolve their liability to the United
24 States or a State in a judicially approved settlement are protected from
25 contribution claims.  42 U.S.C. § 9613(f)(2).  Notably, "person," as defined in
26 CERCLA Section 101, specifically includes the United States.  42 U.S.C.
27 § 9601(21).  Given this statutory scheme, courts have concluded that settling
28 federal agencies are entitled to contribution protection in the same manner as

-10-

1   settling non-governmental entities.  See Avnet, Inc. v. Allied-Signal, Inc., 825 F.

2   Supp. 1132, 1142 (D.R.I. 1992); U.S. v. Wallace, 893 F. Supp. 627, 635 (N.D.

3   Tex. 1995).  As the Avnet court aptly stated, a party "cannot demand that the

4   United States be a 'person' for the purposes of the liability provision in CERCLA

5   but not a 'person' for the purposes of the contribution protection provisions." 825

6   F. Supp. at 1142.

7                    ii.  EPA properly established the Settling Federal Agencies'
                          allocated share based on their comparative fault

8

9        The CR-6 argue that the United States has not sued the Settling Federal

10  Agencies and has not explained the basis for its claims against them.  Aerojet

11  asserts that the contribution protection cannot be broader than the matters settled.

12  However, a consent decree may extend beyond the parameters of the pleadings in

13  a case.  Thus, even unpleaded claims can be part of a consent decree.  United

14  States v. Davis, 261 F.3d 1, 22 (1st Cir. 2001); accord, United States v. George

15  Trucking, Inc., 34 F.3d 1081, 1090-91 (1st Cir. 1994).  Moreover, contribution

16  protection may extend to a matter for which the government does not make a claim

17  against the settling party.  See SEPTA, 235 F.3d at 821-23 (court did not limit

18  contribution protection to the work to be undertaken pursuant to the decree).

19       Furthermore, contrary to the CR-6's argument, EPA explained this

20  settlement to the CR-6 and Aerojet representatives in a telephone call on June 29,

21  2007.  Praskins Decl. ¶18.[9]  In addition, the public record in this case

22  demonstrates the basis for EPA's claim.  On November 5, 2001, EPA issued a

23  "Notice of Potential Liability" to the U.S. Department of Defense relating to the

24

25

26  _____

27  [9] The United States does not agree with the CR-6's argument that an additional
    public comment period is necessary.  The CR-6 had adequate opportunity to

28  comment on the terms of the proposed Consent Decree during the 30-day public
    comment period.

1  BPOU Area. Id. at ¶8.[9/] In that Notice, EPA stated that the United States had
2  potential liability as a former owner (from 1943 to 1948) of a facility located at
3  1100 W. Hollyvale Street in Azusa, California (the "Hollyvale Street property"),
4  which had been owned and operated by Aerojet. Id. As EPA explained to Aerojet
5  and the CR-6 on June 29, 2007, EPA relied on the finding in its Notice of
6  Potential Liability to determine an appropriate allocated share for the Settling
7  Federal Agencies. Id. at ¶18. In their comment letter, the CR-6 reiterate their
8  arguments that the Settling Federal Agencies may have some liability at other
9  BPOU Area properties or based on their alleged role as an operator or arranger.
10 The United States does not find these scattershot arguments to be persuasive. EPA
11 carefully considered the available evidence before concluding in the Notice of
12 Potential Liability that the U.S. Department of Defense was potentially liable as a
13 former owner of the Hollyvale Street property.

14      EPA determined an allocated share for the Settling Federal Agencies by
15 starting with the same volatile organic compounds ("VOC") allocation model it
16 had used for settlements with private PRPs at the BPOU Area. Id. at ¶12. In order
17 to calculate a share for the Settling Federal Agencies, EPA considered that the
18 Settling Federal Agencies were liable as former owners at the Hollyvale Street
19 Property. Id. at ¶14. Aerojet and its parent corporation, GenCorp, Inc., which
20 owned and operated the Hollyvale Street property, are the only named PRPs
21 responsible for perchlorate contamination in the BPOU Area and are also believed
22 to be a source of N-nitrosodimethylamine ("NDMA") contamination in the BPOU
23 Area. Id. at ¶13. Perchlorate and NDMA are not VOCs and were not accounted
24 for in EPA's VOC allocation model. Id. After reviewing its VOC allocation
25 model calculation for the share of the Hollyvale Street property, EPA also
26 considered the cost of perchlorate and NDMA remediation in the BPOU Area

27

28

[9/] The CR-6 and Aerojet had copies of this Notice. Praskins Decl. ¶8.

1   remedy and accounted for that in the allocated share of the Hollyvale Street
2   property. Id. EPA then determined that the allocated share for the Hollyvale
3   Street property should be approximately 68 percent of the costs of the BPOU
4   remedy. Id. EPA calculated a share for the Settling Federal Agencies, as former
5   owners of the Hollyvale Street property, based on two other factors. First, the
6   Settling Federal Agencies' liability was limited to a five-year period of ownership.
7   Id. at ¶14. Because Aerojet had owned and/or operated at that property for 58
8   years, the Settling Federal Agencies were owners of the property for 8.6 percent of
9   that time period. Id. Second, after reviewing the case law, EPA considered the
10  relative comparative fault of an owner at this property and decided that an
11  appropriate share for an owner of the Hollyvale Street property should be
12  approximately 30 percent. Id. at ¶15. Based on these considerations, EPA
13  determined that the Settling Federal Agencies should be allocated a 1.75 percent
14  share, which is the product of the following calculation:  0.68 (Hollyvale Street
15  property's total allocated share of the BPOU Area costs) times 0.086 (Settling
16  Federal Agencies' percentage of time of ownership) times 0.30 (owner's share).
17  Id.

18        The CR-6 assert that CERCLA case law expresses dissatisfaction with cost
19  allocations based on time, citing U.S. v. Burlington Northern & Santa Fe Ry. Co.,
20  479 F.3d 1113 (9th Cir. 2007).  This reliance on Burlington Northern is misplaced.
21  First, Burlington Northern is inapposite here because it did not directly address a
22  circumstance in which a district court was reviewing a proposed settlement
23  entered into by EPA.  In Montrose Chemical Corp., 50 F.3d at 746, the Ninth
24  Circuit confirmed that "CERCLA's policy of encouraging early settlements is
25  strengthened when a government agency charged with protecting the public
26  interest" has constructed the proposed settlement.  As the court concluded in
27  Cannons Engineering Corp., 899 F.2d at 85, CERCLA's "legislative history makes
28  pellucid that, when such consent decrees are forged, the trial court's review

1  function is only to 'satisfy itself that the settlement is reasonable, fair, and

2  consistent with the purposes that CERCLA is intended to serve.'" Quoting H.R.

3  Rep. No. 99-253, pt. 3 (1985), as reprinted in 1986 U.S.C.C.A.N. 3038, 3042.

4    Second, the CR-6 have misconstrued Burlington Northern by conflating the

5  concepts of apportionment under CERCLA Section 107 and allocation under

6  CERCLA Section 113. In Burlington Northern, the Ninth Circuit confirmed that

7  joint and several liability was the norm under CERCLA Section 107 and that

8  apportionment of damages, based on the proof of divisibility of harm under

9  Section 433A of the Restatement (Second) of Torts, is the exception. Id. at 1136.

10  The court concluded that the defendant in Burlington Northern could not avoid

11  joint and several liability under CERCLA Section 107 based on its time of

12  ownership because of an "evidentiary vacuum" concerning the amount of

13  contamination at the property traceable to the period before defendant had leased

14  the property. Id. at 1135. In contrast, the Ninth Circuit expressly recognized that

15  in determining allocation issues, which arise in contribution claims under

16  CERCLA Section 113(f), "the court may allocate response costs among liable

17  parties using such *equitable factors* as the court determines are appropriate." Id. at

18  1130, citing 42 U.S.C. § 9613(f) (emphasis in original); see also Pinal Creek

19  Group v. Newmont Mining Corp., 118 F.3d 1298, 1301 (9th Cir. 1997) (a PRP's

20  contribution liability corresponds to that party's equitable share of total liability).

21  In the settlement context for the BPOU Area, EPA used its VOC allocation model

22  to calculate an approximate allocated share for each defendant. Praskins Decl.

23  ¶12. EPA's allocation effort attempted to duplicate an allocation that would occur

24  in a contribution action under CERCLA Section 113 by looking at each party's

25  comparative fault. See Carson Harbor Village, Ltd. v. Unocal Corp., 270 F.3d

26  863, 884 (9th Cir. 2001) (CERCLA's contribution provisions allow a Court or

27  EPA to ensure that a PRP with minimal responsibility does not get stuck with

28  more than its fair share of financial responsibility for a cleanup). EPA adjusted

1   the Settling Federal Agencies' share based on perchlorate and NDMA

2   contamination at the Hollyvale Street property, as explained above, and other

3   equitable factors such as the limited role of the Settling Federal Agencies as a

4   former owner, not an operator, of the Hollyvale Street property, and the limited

5   period of ownership. Id. at ¶¶13, 14, 15.  In this settlement context, EPA

6   appropriately considered the Settling Federal Agencies' limited period of

7   ownership as an equitable factor in determining their allocated share.  Finally, as

8   courts have repeatedly recognized, the measure of comparative fault is necessarily

9   imprecise and, if fair and reasonable, should be left largely to EPA's expertise.

10  Cannons Eng'g Corp., 899 F.2d at 87.

11              iii.  The scope of the contribution protection afforded the
                     Settling Federal Agencies is appropriate
12

13          Both the CR-6 and Aerojet object to the scope of the Settling Federal

14  Agencies' contribution protection, which covers EPA's possible implementation

15  of future work for the interim ROD.[7]  The United States believes that the concern

16  expressed by the CR-6 and Aerojet is overstated.  First, the contribution protection

17  extended to the Settling Federal Agencies in this Consent Decree addresses only

18  "Response Costs" and "DTSC Response Costs" as defined in the Consent Decree.

19  Decree at ¶34.  "Response Costs" is defined to include all past costs incurred by

20  the United States and all future costs related to the implementation or oversight of

21  the work that the United States will incur at or in connection with the BPOU Area

22  for the interim ROD. Id. at ¶3.  Similarly, "DTSC Response Costs" is also a

23  limited term. Id.  Moreover, the terms Response Costs and DTSC Response Costs

24  _____

25  [7] At this point, the United States has entered into nine settlements with private

26  PRPs at the BPOU Area, including a settlement with Aerojet and its parent
    corporation and a settlement with the CR-6. Praskins Decl. ¶¶9, 10, 11.  These
27  settlements also contain contribution protection for the settling parties. Eight of

28  these nine settlements have been approved by this Court. Id. at ¶9.  The ninth
    settlement was approved by a Bankruptcy Court. Id.

1  do not include the cost of the work that is being funded by the CR-6 and Aerojet.

2  Accordingly, the Settling Federal Agencies do not have contribution protection

3  against the CR-6 or Aerojet in any future contribution action to recover the cost of

4  the work.

5      EPA has estimated that its future oversight costs will average approximately

6  $150,000 per year for the interim remedy. Praskins Decl. ¶16. Pursuant to

7  settlement agreements with Aerojet and the CR-6, the PRPs will reimburse the

8  United States for 88 percent of those costs. Id. at ¶¶10, 11. Furthermore, the

9  United States does not anticipate that it will be necessary for it to implement the

10  work for the interim ROD. At this point, work at the BPOU Area for the interim

11  remedy is being done by the CR-6 and Aerojet pursuant to EPA's Order. Id. at ¶7.

12  If one of the Work PRP Group does not perform, the other PRPs are jointly and

13  severally liable to perform the work under the terms of the BPOU Project

14  Agreement. Id. The BPOU Project Agreement also contains a back-up insurance

15  policy to provide for the work. Id.; see SEPTA, 235 F.3d at 825 (uncertainty

16  regarding EPA's future costs should not be used to hinder settlement). Finally,

17  both the CR-6 and Aerojet have already settled with the United States and

18  resolved their obligations for both past costs and future oversight costs for the

19  interim remedy. Id. at ¶¶10, 11. Accordingly, the United States believes that the

20  limited contribution protection afforded the Settling Federal Agencies in the

21  Consent Decree is fair and reasonable.

22              c. Adequacy and Use of Settlement Amounts

23      The CR-6 argue that the proposed settlement payment by the Settling

24  Federal Agencies is inadequate. Both the CR-6 and Aerojet argue that the

25  settlement amounts should be utilized for direct response costs at the BPOU Area

26  and that EPA should not have the flexibility to use these funds at other Superfund

27  sites. These arguments are unpersuasive.

28      As we stated above, EPA calculated an allocated share for the Settling

1  Federal Agencies based on their status as a past owner of the Hollyvale Street
2  property. Praskins Decl. ¶¶13, 14. The allocated share took into account the
3  extent and type of contamination at the Hollyvale Street property, the status of the
4  Settling Federal Agencies as a past owner of the property, and the limited number
5  of years that they owned the property. Id. at ¶¶13, 14, 15. Moreover, the payment
6  by the Settling Federal Agencies resolves only two issues, Response Costs and
7  DTSC Response Costs, as defined in Paragraph 3 of the Decree.[9] Accordingly,
8  the covenant for the Settling Federal Agencies covers only Response Costs and
9  DTSC Response Costs (Decree ¶¶19, 20), and the contribution protection afforded
10 to the Agencies is also limited to Response Costs and DTSC Response Costs.
11 Decree ¶34. EPA and DTSC specifically reserve their rights to pursue
12 enforcement actions against the Settling Federal Agencies if previously unknown
13 conditions are discovered (Decree ¶¶21, 22), and EPA reserves its right to issue
14 and enforce a CERCLA Section 106 order. Decree ¶24. Nothing in this Consent
15 Decree affects the right of the PRP Work Group, the CR-6 and Aerojet, from
16 pursuing a contribution action against the Settling Federal Agencies for the cost of
17 the work at the BPOU Area.

18         Under similar circumstances, the court in Cannons Eng'g Corp. stated that
19 "[t]he choice of the yardstick to be used for allocating liability must be left
20 primarily to the expert discretion of the EPA." 899 F.2d at 88. Similarly, the
21 Court should not attempt to hold EPA to "a standard of mathematical precision" in
22 assessing the amount of the settlement. Id. at 90; accord, United States v. Rohm &
23 Haas Co., 721 F. Supp. 666, 687 (D.N.J. 1989) (when a money settlement is
24 shown to bear a reasonable relationship to a plausible estimate of the settling
25

26 _____
27 [9] Pursuant to the ASCBA Settlement Agreement, the United States agreed to
   reimburse Aerojet for 88 percent of remedial action costs incurred by Aerojet at
28 the Hollyvale Street property. Thus, through that Agreement, the United States is
   funding a substantial part of the cost of Aerojet's work in the BPOU Area.

1    parties' volumetric contribution, CERCLA requires that such a settlement be
2    accepted and entered as a consent decree).  In this case, the United States requests
3    the Court to enter this Consent Decree with the Settling Defendants and the
4    Settling Federal Agencies because it is based on comparative fault and assigns
5    liability according to rational estimates of the harm caused by each party.  SEPTA,
6    235 F.3d at 823.

7         Pursuant to the terms of this Consent Decree, EPA retains the payments by
8    Settling Defendants and the Settling Federal Agencies in a Special Account where
9    the funds can be used, if necessary, to conduct or finance response actions at the
10   BPOU Area.  Decree ¶¶8, 11.a.  This Decree's designation of a Special Account is
11   consistent with CERCLA Section 122(b)(3), 42 U.S.C. § 9622(b)(3), which allows
12   the government to retain and use such amounts to carry out an agreement, and with
13   EPA's guidance on Special Accounts.  Praskins Decl. ¶20.  Moreover, all of the
14   other BPOU Area judicial settlements, including the settlements with the CR-6
15   and Aerojet, have similar language regarding payments to Special Accounts.  Id.
16   Consistent with the other BPOU Area judicial settlements and EPA's guidance on
17   Special Accounts, the United States believes that it is appropriate for EPA to
18   retain the discretion in this Consent Decree to transfer the payments from a Special
19   Account to the Superfund.

20   **IV.  CONCLUSION**

21        For the reasons stated herein, the Consent Decree is fair, reasonable,
22   consistent with CERCLA, and serves the public interest.  Accordingly, the United
23   States requests the Court to grant its request to sign and enter the attached Order,
24   which will re-approve entry of the Consent Decree and designate the effective date

25

26

27

28

1  of the Decree as the date that the Court enters the proposed Order.

2  Respectfully submitted,

3

4  Dated: August 29, 2007                    Robt D Mullaney

5                                            Robert D. Mullaney
                                             Trial Attorney
6                                            Environmental Enforcement Section
                                             Environment and Natural Resources
7                                             Division
                                             U.S. Department of Justice
8                                            301 Howard Street, Suite 1050
                                             San Francisco, California  94105
9                                            Tel: (415) 744-6491
                                             Fax: (415) 744-6476
10                                           Attorneys for Plaintiff United States of
                                              America
11

12  OF COUNSEL:

13  LEWIS MALDONADO
    Assistant Regional Counsel
14  U.S. EPA, Region 9
    75 Hawthorne Street
15  San Francisco, California  94105

16

17

18                              **ORDER**

19        IT IS ORDERED that the Consent Decree in <u>United States, et al., v. Azusa</u>

20  <u>Pipe and Tube Bending Corp., et al.</u>, Case No. CV-06-0165-CAS(RZx), lodged

21  with this Court on June 21, 2007, is re-approved.  After considering the United

22  States' Request to Enter, the Court finds that the Consent Decree is fair,

23  reasonable, and in the public interest.  Therefore, the Court enters the following

24  Order.

25  1.    The United States' request to enter the Consent Decree is granted.  The

26  Court previously entered the Consent Decree on July 24, 2007.

27

28

                              -19-

1   2.    The effective date of the Consent Decree shall be the date that this Order is

2   entered by the Court.

3

4   Dated: _____*September 4, 2007*_____

5

6                                  *Christina A. Snyder*

7                                  Christina A. Snyder
                                    United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-20-

SCANNED

1
2
3
4
5
6
7
8
9
10
11
12
13
14          ATTACHMENT A
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Westlaw.

72 FR 37053-01                                                            Page 1

72 FR 37053-01, 2007 WL 1944237 (F.R )

**(Cite as: 72 FR 37053)**


NOTICES

DEPARTMENT OF JUSTICE

Notice of Lodging of Consent Decree Under the Comprehensive Environmental
Response, Compensation, and Liability Act and the Solid Waste Disposal Act

Friday, July 6, 2007

Notice is hereby given that on June 21, 2007, a proposed Consent Decree in United
States and California Department of Toxic Substances Control v  Azusa Pipe and
Tube Bending Corp., et al., Case No. CV06-165 CAS (RZx) (C.D. Cal.), relating to
the Baldwin Park Operable Unit of the San Gabriel Valley Superfund Sites, Areas
1-4, located in and near the cities of Azusa, Irwindale, Baldwin Park, and Covina
in Los Angeles County, California ("BPOU"), was lodged with the United States
District Court for the Central District of California

The proposed Consent Decree is a settlement of claims brought against. (1) Azusa
Pipe and Tube Bending Corp. ("Azusa Pipe") as well as individual owners of the
Azusa Pipe property (collectively, the "Settling Defendants"), and (2) General
Services Administration, Department of the Army, Department of Defense, Department
of the Navy, Department of the Air Force, and Army Corps of Engineers ("Settling
Federal Agencies"), pursuant to the Comprehensive Environmental Response,
Compensation, and Liability Act ("CERCLA"), 42 U.S.C. 9601-9675, and Section 7003
of the Solid Waste Disposal Act, as amended by the Resource Conservation and
Recovery Act of 1976 and the Hazardous and Solid Waste Amendments of 1984
(collectively "RCRA"), 42 U S C  6973.

*37054 The proposed Consent Decree requires the Settling Defendants to pay
$1,025,000 to the United States for response costs incurred by the U S
Environmental Protection Agency ("EPA") and the U.S. Department of Justice
("Department of Justice" or "DOJ"), and to pay $75,000 to the California
Department of Toxic Substances Control ("DTSC") for response costs incurred by
DTSC. The proposed Consent Decree includes a covenant not to sue the Settling
Defendants under Sections 106 and 107 of CERCLA, 42 U.S C. 9606, 9607, and under
Section 7003 of RCRA, 42 U.S.C  6973

The proposed consent Decree also requires the Settling Federal Agencies to pay
$490,000 to EPA for response costs incurred by EPA DOJ, and to pay $105,000 to
DTSC for response costs incurred by DTSC  The Consent Decree includes a covenant
not to sue the Settling Federal Agencies under CERCLA Section 107, 42 U.S.C. 9607.

The Department of Justice will receive for a period of thirty (30) days from the

© 2007 Thomson/West  No Claim to Orig  U S  Govt  Works.

https://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split .. 8/23/2007

72 FR 37053-01                                                                    Page 2

72 FR 37053-01, 2007 WL 1944237 (F R.)

**(Cite as: 72 FR 37053)**


date of this publication comments relating to the Consent Decree  Comments should
be addressed to the Assistant Attorney General, Environment and Natural Resources
Division, and either e-mailed to pubcomment-ees enrd@usdoj.gov, or mailed to P O
Box 7611, U S  Department of Justice, Washington, DC 20044-7611, with a copy to
Robert Mullaney, U.S. Department of Justice, 301 Howard Street, Suite 1050, San
Francisco, CA 94105, and should refer to United States, et al , v. Azusa Pipe and
Tube Bending Corp., et al , D J  Ref. 90-11-2-354/22. Commenters may request an
opportunity for a public meeting in the affected area, in accordance with Section
7003(d) of RCRA, 42 U.S.C. 6973(d)

 The Consent Decree may be examined at U S  EPA Region 9, Office of Regional
Counsel, 75 Hawthorne Street, San Francisco, California  During the public comment
period, the Decree may also be examined on the following Department of Justice Web
site  http://www usdoj.gov/enrd/Consent-- Decrees.html. A copy of the Consent
Decree may also be obtained by mail from the Consent Decree Library, P.O. Box
7611, U.S. Department of Justice, Washington, DC 20044-7611 or by faxing or
e-mailing a request to Tonia Fleetwood (tonia.fleetwood@usdoj.gov), fax number
(202) 514-1547. In requesting a copy from the Consent Decree Library, please
enclose a check in the amount of $91.25 (25 cents per page reproduction cost)
payable to the U.S. Treasury or, if by e-mail or fax, forward a check in that
amount to the Consent Decree Library at the stated address  In requesting a copy
exclusive of exhibits, please enclose a check in the amount of $9.25 (25 cents per
page reproduction cost) payable to the U.S. Treasury

Henry Friedman,

Assistant Chief, Environmental Enforcement Section, Environment and Natural
Resources Division.

[FR Doc  07-3271 Filed 7-5-07; 8·45 am]

BILLING CODE 4410-15-M

 72 FR 37053-01, 2007 WL 1944237 (F R )

END OF DOCUMENT

© 2007 Thomson/West  No Claim to Orig. U S. Govt  Works

SCANNED

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ATTACHMENT B

# HellerEhrman LLP

August 6, 2007

Lawrence A Hobel
lawrence.hobel@hellerehrman.com
Direct +1 415 772.6348
Main +1 415 772.6000
Fax +1 415 772 6268

16297-0002

**VIA U.S. MAIL and EMAIL:** pubcomment-ees.enrd@usdoj.gov

Assistant Attorney General
Environment and Natural Resources Division
P.O. Box 7611
U.S. Department of Justice
Washington, DC  20044–7611

> **RE:** **Proposed Consent Decree**
> ***United States, et al., v. Azusa Pipe and Tube Bending Corp., et al.,***
> **D.J. Ref. 90–11–2–354/22.**

Dear Sir or Madam:

This letter is provided by Aerojet-General Corporation ("Aerojet"), one of the parties that is funding the remedial action and paying the government's oversight costs at the Baldwin Park Operable Unit ("BPOU") of the San Gabriel Valley Superfund Sites in Los Angeles County, California.

## I.   BACKGROUND REGARDING THE AZUSA PIPE SETTLEMENT

On June 21, 2007, a proposed Consent Decree in *United States and California Department of Toxic Substances Control v. Azusa Pipe and Tube Bending Corp., et al.,* Case No. CV06–165 CAS (RZx) (C.D. Cal.), relating to the Baldwin Park Operable Unit of the San Gabriel Valley Superfund Sites, Areas 1–4, located in and near the cities of Azusa, Irwindale, Baldwin Park, and Covina in Los Angeles County, California ("BPOU"), was lodged with the United States District Court for the Central District of California.

The Parties to the proposed Consent Decree are (1) the United States, on behalf of the U.S. Environmental Protection Agency ("EPA"), (2) the California Department of Toxic Substances Control ("DTSC"), and (3) the "Settling Defendants," including Azusa Pipe and Tube Bending Corp., Frederick G. Tressel, Ronald F Tressel, and Frederick G.

---

Heller Ehrman LLP  333 Bush Street  San Francisco, CA  94104-2878  www.hellerehrman.com

**San Francisco**  Silicon Valley  London  Los Angeles  San Diego  Seattle  Portland  Anchorage  New York  Washington D C  Hong Kong  Singapore Beijing

Att. B

# HellerEhrman
ATTORNEYS

Tressel and Violet M. Tressel, Trustees of the Tressel Family Trust.[1]  Also included in the proposed Consent Decree, but not as Parties to the action, are certain "departments, agencies and instrumentalities of the United States identified therein as the "Settling Federal Agencies": the United States General Services Administration, Department of the Army, Department of Defense, Department of the Navy, Department of the Air Force, and the Army Corps of Engineers.[2]

On Friday, July 6, 2007, a notice was published in the Federal Register, Vol. 72, No. 129, pages 37053-54, requesting that comments regarding the proposed Consent Decree be submitted within thirty days of publication.

## II.   BACKGROUND ON THE PROPOSED CONSENT DECREE

### A.   The Settling Federal Agencies Are Not Parties to the Underlying Action

As noted above, none of the Settling Federal Agencies is named in the Complaint. However, the Consent Decree purports to release the Settling Federal Agencies from certain CERCLA liabilities.

### B.   The Scope of Release and Contribution Protection

Paragraph 19 contains a covenant that EPA purports to have this Court issue to the Settling Federal Agencies.  Except as to reserved rights described in Section IX, "EPA covenants not to take administrative action against Settling Federal Agencies pursuant to Section 107(a) . . . to recover Response Costs."  (DTSC makes a like covenant not to sue in Paragraph 20.)

Section IX contains various reservations of rights.  Among other matters, EPA and DTSC reserve the right to pursue Settling Federal Agencies for Response Costs in the event of discovery of previously unknown conditions or information.  (See Paragraphs 21 and 22)

---

[1] Proposed Consent Decree at 5-6.

[2] Proposed Consent Decree at 6 and Appendix E.

Att. B

# HellerEhrman
ATTORNEYS

The United States proposes that the Court give the United States contribution protection described at Paragraph 34:

> Settling Federal Agencies are entitled, as of the effective date of this Consent Decree, to protection from contribution actions or claims as provided by CERCLA Section 113(f)(2), 42 U.S.C. 9613(f)(2), for 'matters addressed' in this Consent Decree. For purposes of this Paragraph, 'matters addressed' shall mean Response Costs and DTSC Response Costs."

The term "Response Costs" is defined (Paragraph 3) as (i) all past costs; and "(ii) all future costs (including but not limited to, direct and indirect costs) related to the **implementation or oversight** of the Work that the United States will incur at or in connection with the BPOU Area." (emphasis added)

The term "Response Costs" apparently could include costs that the United States or DTSC could incur under their reservation of rights.

## C.      The Proposed "Consideration"

For the protections against direct claims and contribution claims for oversight or implementation costs of the Work, the Consent Decree requires only that the Settling Federal Agencies pay $490,000 to the United States and $105,000 to DTSC.

## D.      The BPOU Remedial Action and Oversight Costs

Aerojet is one of several parties (with the CR-6 Group) to have entered into the Project Agreement for the implementation of remedial action (the Cooperating Respondents.)  The Project Agreement is a contract with various water entities and terminates in 2017.  The potential exists for additional response action after 2017 to implement remedial action.   Aerojet is one of several parties (along with the CR6 Group and other entities) that have been named as respondents under EPA's Administrative Order No. 2000-13 to implement the Work (as that term is described in the Consent Decree).

Aerojet has entered into a Consent Decree for the payment of EPA's oversight costs, which the Court entered on December 13, 2005 (the "Aerojet Consent Decree"). The Aerojet Consent Decree requires Aerojet to make payment on EPA's past costs and as to EPA's future oversight costs.  It does not establish Aerojet's obligation to "implement" the Work nor to pay for EPA's implementation of such Work.  It does not provide Aerojet protection for "implementation . . . of the Work." Aerojet understands

Att. B

Case 2:06-cv-00165-CAS-RZ   Document 44   Filed 09/05/07   Page 36 of 48   Page ID #:111

**HellerEhrman**
ATTORNEYS

Assistant Attorney General
Environmental and Natural Resources Division
August 6, 2007
Page 4

that the CR-6 group also entered into one or more Consent Decree, which contain like limited obligations and releases; namely, release of past costs and obligation to pay a percentage of EPA's future oversight costs.

### III.   BACKGROUND ON AEROJET'S OVERHEAD AGREEMENT WITH THE UNITED STATES

Pursuant to an agreement entered between the United States and Aerojet (referred to often as the "ASBCA Settlement" or "Overhead Agreement")[3], Aerojet is granted the right to allocate Site Restoration Costs against government contracts in accordance with that agreement as part of the pricing of contracts. Site Restoration Costs are defined very broadly, and include costs incurred by Aerojet to implement remedy, Aerojet paid agency oversight costs, and agency or other third party costs to implement the remedy for which Aerojet is liable. In sum, Site Restoration Costs include that which the Consent Decree defines as Response Costs and DTSC Response Costs.

### IV.   COMMENTS ON THE PROPOSED CONSENT DECREE

#### A.   No Impairment of Aerojet's Government Contract Rights

The Consent Decree cannot impair Aerojet's rights under that Overhead Agreement nor can it impair the right of Aerojet under contracts with the United States under applicable regulations governing the procurement of goods and services from the United States. Based upon discussion with Mr. Mullaney, representing the United States, we understand that it is **not** the intent of this Consent Decree to impair those rights to price contracts. We request that this be confirmed in response to this comment.

#### B.   The Court should not enter a Decree granting contribution protection as to Settling Federal Agencies

Here, the United States has created a Consent Decree to give itself contribution protection from claims that might be brought by PRPs against the United States in the event that the United States (i) incurs oversight costs or implementation costs and (ii)

---

[3] "ASBCA Settlement" means the Armed Services Board of Contract Appeals Settlement Agreement entered into between the United States, on behalf of the United States Department of Defense, and Aerojet on November 29, 1992, as subsequently modified.

-28-

Att. B

# HellerEhrman
A T T O R N E Y S

Assistant Attorney General
Environmental and Natural Resources Division
August 6, 2007
Page 5

recovered those costs from the PRPs. (The contribution protection would not preclude claims of a PRP when the PRP incurs the cost itself, because it would not be a cost of the United States (or DTSC) to implement the Work.)

The United States has not sued itself in this action. We believe that there would be serious Constitutional issues were the United States permitted to enter into an agreement with itself to preclude liability to others, CERCLA does not authorize what the United States seeks.

First, CERCLA does not authorize a settlement between the United States and itself that would be binding on others. There is nothing in section 122 of CERCLA, which governs settlements, which allows it.

Second, even if CERCLA section 122 allowed a settlement, the provisions of CERCLA section 113 preclude the request the U.S. makes here for contribution protection. Under CERCLA section 113,

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title.

Accordingly, a right of contribution is from "any person" to "any other person." The contribution protection provision follows:

> A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

CERCLA defines person:

> The term "person" means an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body.

Att. B


**HellerEhrman**
ATTORNEYS

The Settling Federal Agencies are not separate and apart from the United States, they are part of the United States. The statute does not authorize the granting of contribution protection to the United States because the United States has entered into an agreement with itself. The United States cannot be said to have resolved its liability "to the United States."

    **C.**     **This Court should not enter the Consent Decree because it extends to future "implementation" not simply future oversight costs. There is no Basis for Providing the Settling Federal Agencies with protection for the payment of $490,000 to EPA and $110,000 to DTSC.**

The proposed Consent Decree does not detail any allegations of law or fact against the Settling Federal Agencies. The record before the District Court contains no information about the potential liability of the Settling Federal Agencies or even a basis for evaluating as to the relationship between any claim and the settlement, let alone the basis for the settlement amount.

The Consent Decrees that the United States has entered with Aerojet and the CR-6 are limited to past costs and future Oversight Costs. Here, the proposed Consent Decree extends to "implementation" costs. There is no explanation, nor can there be a reasonable basis for concluding that the settlement amounts are adequate in relation to implementation costs.

Finally, the contribution protection language proposed is broader than the matters settled, which would violate CERCLA section 113. The Consent Decree specifically reserves to EPA and DTSC the right to proceed against Settling Federal Agencies in the event of newly discovered conditions or chemicals. The contribution protection states that "matters addressed" are Response Costs and DTSC Response Costs. However, EPA and DTSC reserve the right to pursue the Settling Federal Agencies as to reserved claims, which appear to include claims for Response Costs and DTSC Response Costs. As the Consent Decree does not resolve the liability of the Settling Federal Agencies for Response Costs and DTSC Response Costs under reopener conditions, the contribution protection, if allowed, is overbroad.

         Att. B


# HellerEhrman
A T T O R N E Y S

**D.    Settlement Should be Used for BPOU Site Costs**

The proposed Consent Decree states that the amounts paid to the EPA by the Settling Defendants[4] and the Settling Federal Agencies[5] is to be retained and used to conduct or finance response actions at or in connection with the BPOU area, or be transferred by EPA to the EPA Hazardous Substance Superfund.  Payments made to DTSC by the Settling Defendants are not earmarked in any manner as to their future use.[6] Payments to DTSC by the Settling Federal Agencies are identified only as "reimbursement."[7]  It is unclear as to exactly what costs are being reimbursed by this payment.

Given the enormity of the cleanup of the BPOU, and the high cost of the sophisticated technologies used in the clean-up, all money from this settlement must be utilized for direct response costs, either by the EPA or the DTSC.  EPA, in particular, should not have the flexibility to use these funds for the clean-up of other sites.  This

---

[4] Proposed Consent Decree ¶ 8.

[5] *Id.* ¶ 11.

[6] *Id.* ¶ 9

[7] *Id.* ¶ 11.

Att. B



provision undermines the goals of the BPOU clean-up, and further diminishes the value of what is truly a de minimis settlement.

Very truly yours,

Lawrence A. Hobel

cc via email and mail:
Robert D. Mullaney
Lewis C. Maldonado

cc via email:
CR Group

Att. B



## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D C

August 6, 2007

OUR FILE NUMBER
016,229-002

**Via U.S. Mail and E-Mail:** pubcomment-ees.enrd@usdoj.gov

Assistant Attorney General
Environment and Natural Resources Division
P.O. Box 7611
U.S. Department of Justice
Washington, DC  20044–7611

WRITER'S DIRECT DIAL
(213) 430-6273

WRITER'S E-MAIL ADDRESS
bnicksin@omm.com

> RE:  **Proposed Consent Decree**
> *United States, et al., v. Azusa Pipe and Tube Bending Corp., et al.,*
> **D.J. Ref. 90–11–2–354/22.**

Dear Sir or Madam:

Thank you for this opportunity to provide comments on the proposed Consent Decree in the above captioned matter.  This comment letter is provided jointly by six of the companies that are funding the remedial action and paying the government's oversight costs at the Baldwin Park Operable Unit ("BPOU") of the San Gabriel Valley Superfund Sites in Los Angeles County, California.  These six companies (referred to herein as "Cooperating Respondents" or the "CR6") are Azusa Land Reclamation Co., Inc., Fairchild Holding Corp., Hartwell Corporation, Chemical Waste Management, Inc. (successor in interest to Oil & Solvent Process Company), Reichhold, Inc., and Winco Enterprises Inc. (formerly known as Wynn Oil Company).

## I.     BACKGROUND REGARDING THE AZUSA PIPE SETTLEMENT

On June 21, 2007, a proposed Consent Decree in *United States and California Department of Toxic Substances Control v. Azusa Pipe and Tube Bending Corp., et al.*, Case No. CV06-165 CAS (RZx) (C.D. Cal.), relating to the Baldwin Park Operable Unit of the San Gabriel Valley Superfund Sites, Areas 1–4, located in and near the cities of Azusa, Irwindale, Baldwin Park, and Covina in Los Angeles County, California, was lodged with the United States District Court for the Central District of California.

The Parties to the proposed Consent Decree are (1) the United States, on behalf of the U.S. Environmental Protection Agency ("EPA"), (2) the California Department of Toxic Substances Control ("DTSC"), and (3) the "Settling Defendants," including Azusa Pipe and Tube Bending Corp., Frederick G. Tressel, Ronald F. Tressel, and Frederick G. Tressel and

Att. B

Violet M. Tressel, Trustees of the Tressel Family Trust.[1] Also included in the proposed Consent Decree, but apparently not as Parties, are certain "departments, agencies and instrumentalities of the United States" identified therein as the "Settling Federal Agencies": the United States General Services Administration, Department of the Army, Department of Defense, Department of the Navy, Department of the Air Force, and the Army Corps of Engineers.[2]

On Friday, July 6, 2007, a notice was published in the Federal Register, Vol. 72, No. 129, pages 37053-54, requesting that comments regarding the proposed Consent Decree be submitted within thirty days of publication.[3]

## II.   COMMENTS ON THE PROPOSED CONSENT DECREE

### A.   The Settling Federal Agencies Are Not Parties to the Underlying Action

In their Complaint, the U.S. Attorney General and the DTSC named Azusa Pipe and Tube Bending Corp., Frederick G. Tressel, Ronald F. Tressel, and Frederick G. Tressel and Violet M. Tressel, Trustees of the Tressel Family Trust as defendants. (Case No. CV 06-165 CAS (RZx).) None of the Settling Federal Agencies is named in the Complaint. Because the Settling Federal Agencies are not named in the Complaint, the CR6 - as well as the District Court and the public in general - have no knowledge as to the allegations of law or fact underpinning the government's proposed settlement with the Settling Federal Agencies.

### B.   The Proposed Consent Decree (1) States No Law or Facts Concerning Either the Settling Federal Agencies' Role in the BPOU or Their Participation in the Settlement, and (2) Does Not Support Contribution Protection for Matters Not Alleged or Settled

#### 1.   No Documentation of Law or Facts

The proposed Consent Decree does not detail any allegations of law or fact against the Settling Federal Agencies. The proposed Consent Decree states that the Settling Federal Agencies "are resolving claims that have been or could be asserted against them with regard to [EPA] Response Costs and DTSC Response Costs" as provided in the proposed Consent Decree.[4] But neither the proposed Consent Decree nor any of its related appendices provides any

---

[1] Proposed Consent Decree at 5-6.
[2] Proposed Consent Decree at 6 and Appendix E.
[3] On Friday August 3, 2007, the Cooperating Respondents learned that Consent Decree was inadvertently entered by the District Court before the end of this statutory 30-day period of public notice and comment. We understand that, because these comments are being submitted within the comment period, the Department of Justice will notify the Court that comments have been received and that entry was premature. Additionally, as discussed below in Section G, the CR6 believe that the current notice and comment period is inadequate and the public must be given another 30-day period of public notice and comment, after the Department of Justice provides adequate public notice of the law and facts concerning the alleged role of the Settling Federal Agencies in this matter.
[4] Proposed Consent Decree at 6

Att. B

O'MELVENY & MYERS LLP
Assistant Attorney General, August 6, 2007 - Page 3

indication of what that liability is based upon. The record before the District Court contains no information about the potential liability of the Settling Federal Agencies.

In an effort to gain some understanding of the circumstances giving rise to this proposed settlement with the Settling Federal Agencies, representatives of the Cooperating Respondents recently participated in a conference call with Robert Mullaney, Esq., U.S. Department of Justice, and Lewis Maldonado and Wayne Praskins of the EPA (6/29/2007).[5] During that call, Mr. Mullaney indicated that the proposed settlement with the Settling Federal Agencies is intended to settle their alleged liability for years of government *ownership* of the former Aerojet-General Corp. ("Aerojet") site in Azusa. This raises several questions, including the exact Aerojet property or properties involved in the settlement, the time period of federal ownership, and the contaminants and quantities for which the Settling Federal Defendants are settling liability.

Mr. Mullaney did explain that the proposed settlement with the Settling Federal Agencies was based on their ownership of the Aerojet facility for five years during the 1940s. First, we note that controlling CERCLA case law expresses dissatisfaction with cost allocations based on time. In the recently decided case *U.S. v Burlington Northern & Santa Fe Ry Co.*, 479 F.3d 1113 (9th Cir. 2007), the Ninth Circuit examined the allocation of liability under CERCLA and determined that a simple fraction based on the time that the land was owned cannot be a basis for apportionment. Under *Burlington Northern*, the mere fact that some of the Settling Federal Agencies owned the Aerojet land for a fraction of the total ownership period does not, in itself, provide an adequate basis for allocation of costs. Second, while the CR6 appreciated the opportunity to speak with the EPA and the Department of Justice about the proposed settlement, we note that the limited information received – conveyed orally to a select few interested parties – does not provide an adequate factual record. The information was not made available to the public and, insofar as we are aware, the Government's allegations and bases for the proposed settlement with the Settling Federal Agencies are not documented in a manner that would provide the District Court with any basis for approval or disapproval of the proposed Consent Decree.

In addition to the lack of documentation before the Court regarding the apparent settlement of the Settling Federal Agencies' liability as an *owner* of the Aerojet facility, it appears that the proposed settlement does not address the Settling Federal Agencies' liability as an *operator* of the Aerojet site, which extended from 1943 to well past 1948.[6] This operator liability is likely to be at least as great as the Settling Federal Agencies' allocated share for

---

[5] While much of this comment letter deals with the involvement of the federal government in this matter, as plaintiff (with respect to the Azusa Pipe and Tube entities) and as settling agencies, many of the comments, issues and concerns expressed herein apply with equal force to the proposed settlement with the Department of Toxic Substances Control.

[6] On November 5, 2001, EPA sent the U.S Department of Defense a "Notice of Potential Liability" stating that the United States - through the U.S Department of Defense and "its various predecessors" - is considered a potentially responsible party ("PRP") at the BPOU as a former owner of "some portion" of the Aerojet facility at 1100 W. Hollyvale Street in Azusa, California. There was no allegation in this letter of potential *operator* liability

ownership of that property.  Based on Mr. Mullaney's oral statements that EPA and the Department of Justice considered only the Settling Federal Agencies' ownership of the Aerojet facility, it seems that the Settling Federal Agencies are only settling their ownership liability and leaving for future consideration their operator liability.

The Settling Federal Agencies may also have liability in the BPOU as an owner and/or operator of the adjacent Day & Night facility, the Irwindale Avenue Sewer, and the American Cyanamid facility.  Again, based on Mr. Mullaney's statements, it seems that the Settling Federal Agencies are not settling their ownership and/or operator liability for these other facilities.[7]

## 2.    No Contribution Protection for Matters Not Alleged or Settled

Based on the conversation with counsel from the Department of Justice, the CR6 have been led to understand that the settlement with the Settling Federal Agencies is based only on the Settling Federal Agencies having owned the Aerojet facility for approximately five years. However, the Settling Federal Agencies' liability in the BPOU goes far beyond its liability as an owner of the Aerojet facility, and includes operation of that facility as well as owner/operator liability for other facilities in the BPOU.

The proposed Consent Decree (including as exhibits the BPOU Record of Decision and the Explanation of Significant Differences) and the underlying Complaint are completely devoid of any facts at all pertaining to (1) the Settling Federal Agencies' numerous roles and sources of liability in the BPOU and (2) the legal and factual basis for the proposed settlement.  There is no way for the Court, the Cooperating Respondents, and the public to know that the Department of Justice proposes to settle only *one small aspect* of the Settling Federal Agencies' liability in the BPOU.  Without *any facts at all* on the record, there will be no clear statement of the scope of contribution protection afforded the Settling Federal Defendants, and the corollary scope of the *rights of others* to seek contribution from the Settling Federal Agencies for matters *not* settled in the proposed Consent Decree.

If the proposed settlement does not address and include payment of the Settling Federal Agencies' share of its other BPOU liability (as described, in part, above), then the Settling Federal Agencies must not receive contribution protection for anything more than the limited liability on which the settlement is based.  (*See also* Section C below.)

It is clear that the record before the District Court is bereft of details regarding the role of the Settling Federal Agencies in the BPOU and the bases for the proposed settlement  The Ninth Circuit dealt with the issue of what constitutes an adequate record on which to approve or

---

[7] This short statement is not intended to be a full list of the additional grounds for the Settling Federal Agencies' liability in the BPOU.  As but one example, they may also have liability as "arrangers" under CERCLA

O'MELVENY & MYERS LLP
Assistant Attorney General, August 6, 2007 - Page 5

disapprove a Consent Decree.  In *U.S v. Montrose Chemical Corp. of California*,[8] the Court determined that:

> In conducting an evaluation of whether a CERCLA consent decree is substantively fair, the district court should determine fairness of proportional relationship between proposed liability of settling defendants and government's current estimate of total potential natural resource damages, consider nature of liability of various defendants, such as whether liability is joint and several, and consider other relevant factors including any reasonable discounts for litigation risks and time savings.

The plaintiffs have provided none of the record details required by *Montrose* to ensure a fair evaluation of the proposed Consent Decree.

The CR6 therefore request an explicit detailing of the geographic, quantitative, and temporal scope of the settlement with the Settling Federal Agencies.  The CR6 further request that EPA or the Department of Justice articulate the legal justification and authority for including a settling party in a consent decree where the settling party is not a defendant and has not been named in an action.

### C.  The Settling Federal Agencies Are Not Entitled to (1) Covenants Not To Enforce Administratively and Not To Sue with Respect to Future Costs, or (2) Contribution Protection with Respect to Future Costs

The protections proposed for the Settling Federal Agencies may well undermine the long-term goals of the BPOU cleanup effort.  The proposed Consent Decree sets forth EPA's covenants not to take administrative action against, nor sue, the Settling Federal Agencies to recover Response Costs.[9]  It also provides contribution protection to the Settling Federal Agencies for Response Costs.

"Response Costs" are defined in the proposed Consent Decree as (1) all past costs and (2) all future costs relating to the implementation or oversight of the Work that the United States will incur at or in connection with the BPOU area.[10]  The "Work" is defined as all activities required to be performed to implement the Record of Decision, as supplemented by the Explanation of Significant Differences, at or in connection with the BPOU area.

By including future Work *implementation* costs within the definition of "Response Costs," EPA is proposing to insulate the Settling Federal Agencies from any costs of the remedy if for any reason EPA takes over implementation of the work.  Yet, it is the understanding of the CR6, based on their conversation with counsel at the Department of Justice, that the Settling

---

[8] 50 F 3d 741, 747 (9th Cir 1995).
[9] Proposed Consent Decree ¶ 19
[10] *Id* at 5.

Att. B

O'MELVENY & MYERS LLP
Assistant Attorney General, August 6, 2007 - Page 6

Federal Agencies were not willing to pay any amount for settlement of the costs of the BPOU Work (even if only in connection with their limited liability based on ownership of the Aerojet facility).

Thus, not only is the dollar amount of the proposed settlement wholly inadequate for the Settling Federal Agencies to obtain such broad protections, but the proposed settlement could improperly foreclose the rights of others to seek contribution from the Settling Federal Agencies for Response Costs. There is no basis in law or fact for insulating the Settling Federal Agencies from liability for future Work in the BPOU, particularly if the Department of Justice acknowledges that the Settling Federal Agencies refused to settle this. Similarly, there should be no covenants not to take administrative action against nor sue the Settling Federal Agencies for future Work implementation

### D.  The Settling Federal Agencies' Settlement Amounts are Inadequate

Under the proposed settlement, the Settling Federal Agencies will pay $490,000 to the U.S. and $105,000 to DTSC. The payment to the U.S. would represent about 1.5% of the United States' approximately $32 million in alleged past response costs. This is nothing more than a *de minimis* settlement, without any facts to support it.[11]

The Cooperating Respondents and others have paid and will pay considerably more than the Settling Federal Agencies will , as proposed in the Consent Decree. The CR6 believe that the proposed monetary settlement for the Settling Federal Agencies does not adequately reflect the level of past, let alone future, Response Costs and the overall liability attributable to the Settling Federal Agencies in the BPOU.

### E.  Settlement Funds Should be Used for BPOU Response Costs

The proposed Consent Decree states that the amounts paid to the EPA by the Settling Defendants[12] and the Settling Federal Agencies[13] is to be retained and used to conduct or finance response actions at or in connection with the BPOU area, or be transferred by EPA to the EPA Hazardous Substance Superfund. Payments made to DTSC by the Settling Defendants are not earmarked in any manner as to their future use.[14] Payments to DTSC by the Settling Federal Agencies are identified only as "reimbursement."[15] It is unclear as to exactly what costs are being reimbursed by this payment.

---

[11] The Settling Federal Agencies are being allowed to settle for a smaller percentage-allocated share than any other parties in the BPOU except the White & White entities and the bankrupt Huffy Corporation The Settling Federal Agencies' percentage-allocated share would be less than even J.H Mitchell and Screwmatic Corp., each of which settled for less than its true share on an "inability-to-pay" basis
[12] Proposed Consent Decree ¶ 8.
[13] *Id* ¶ 11.
[14] *Id.* ¶ 9
[15] *Id* ¶ 11.

Att. B

O'MELVENY & MYERS LLP
Assistant Attorney General, August 6, 2007 - Page 7

Given the enormity of the cleanup of the BPOU, and the high cost of the sophisticated technologies used in the clean-up, all money from this settlement must be utilized for direct response costs. In particular, EPA should not have the flexibility to use these funds for the clean-up of other sites. This provision undermines the goals of the BPOU clean-up, and further diminishes the value of what is truly a *de minimis* settlement.

### F.   The Settling Federal Agencies Are Not Subject to All of the Provisions of the Proposed Consent Decree

Many of the provisions of the proposed Consent Decree apply to either the Settling Defendants or the Settling Federal Agencies, but not to both.

Most importantly, the Settling Federal Agencies apparently do not agree that the Consent Decree is "fair, reasonable, and in the public interest."[16]

They also are not included in the "Parties Bound" provision,[17] and do not agree not to challenge the Court's jurisdiction or the terms of the Consent Decree.[18]  Additionally·

- The interest provisions for late payment apply only to Settling Defendants.[19]

- The stipulated penalty provisions apply only to Settling Defendants.[20]

- Only Settling Defendants must pay the government's attorney's fees as needed to enforce the settlement.[21]

- Plaintiff's reservation of rights applies to the Settling Federal Agencies only.[22]

The CR6 believe that the Settling Federal Agencies should face all the potential liabilities and responsibilities as those faced by the Settling Defendants under the Consent Decree. The Court should inquire why the Settling Federal Agencies do not agree that the Consent Decree is fair, reasonable, and in the public interest.

---

[16] *Id* ¶ F (omitting agreement by the Settling Federal Agencies)
[17] *Id* ¶ 2.
[18] *Id* ¶ 1.
[19] *Id* ¶13
[20] *Id* ¶ 14(a)-(f).
[21] *Id* ¶ 15.
[22] *Id* ¶¶ 40-42

Att. B

O'MELVENY & MYERS LLP
Assistant Attorney General, August 6, 2007 - Page 8

### G.   The CR6 Reserve the Right to Comment on Substantive Notice of the Legal and Factual Bases for the Proposed Settlement with the Settling Federal Agencies

As noted throughout this comment letter, the Cooperating Respondents, the District Court and the public have been given *no notice of the law or facts* underlying the government's proposed settlement with the Settling Federal Agencies. Thus, there has been no opportunity for comments on the substance of the government's proposed settlement, and the 30-day period of public notice and comment that purportedly ends on August 6, 2007 should be considered inadequate. The Department of Justice should publish notice of a new 30-day period of public notice and comment, after it provides adequate public notice of the law and facts in this matter. The CR6 reserve the right to submit additional comments at that time.

----

The CR6 thank you for your consideration of these issues and concerns. We look forward to the government's responses to these matters.

Sincerely,

Bob Nicksin, Esq.
for O'Melveny & Myers LLP

cc:   Robert B. Mullaney, Esq.
      U.S. Department of Justice
      301 Howard Street, Suite 1050
      San Francisco, CA  94105

      Lewis C. Maldonado, Esq.
      Section Chief - Office of Regional Counsel
      U.S. Environmental Protection Agency - Region 9
      75 Hawthorne Street
      San Francisco, CA 94105

      CR6 Representatives
      C. Scott Goulart, Larry Hobel, Aerojet-General Corporation
      Chris Conley, GenCorp, Inc.

LA2 837787 5

Att. B